The final case of the day is Angel Guzman, Burke Minahan, et al. v. Robinhood Markets, Inc., Robinhood Financial, LLC, et al., 22-11873. I'll give you all a chance to get set up. Mr. Brannick, I see that you have reserved five minutes for rebuttal. You may proceed when you are ready. Thank you, Your Honor. Good morning. May it please the Court, I'm Steve Brannick representing the plaintiff's appellants. The district court erred in its dismissal of the antitrust complaint. The plaintiff's detailed complaint alleges the who, what, where, why of a plausible antitrust conspiracy between Citadel and Robinhood and demonstrated that this conspiracy caused harm to competition. First, let me turn to the conspiracy count. The allegations demonstrate that Citadel successfully pressured Robinhood into entering into an agreement to execute an agreement to stop purchases of the relevant securities, in other words, to turn off the buy button on its app. Counsel, you're free to argue however you want. I will tell you that I am most troubled for your side of things by the restraint of trade element than the conspiracy element. And I'll just tell you that it seems to me that the district court was right that there seems to be a mismatch between the markets that on the one hand you allege are relevant here, the relevant markets, which are not the securities market, but the PFOF market and the no-fee market, the no-fee brokerage market, and the anti-competitive effect you've lost value in their shares. Can you address that for me? Yeah. So let's go back to section four of the Clayton Act. Section four of the Clayton Act merely requires that the plaintiff demonstrate that they were injured by reason of something forbidden by the antitrust laws. So now both sides agree that the test here is that one, you have to show a restraint. Two, you have to show that that restraint has an anti-competitive effect in the relevant market. And three, you have to show that that damaged consumers. That's exactly what we proved here. I'll tell you, it's the relevant market part that I think is where I'm having the trouble. So the restraint is obvious. It's the agreement between Citadel and Robinhood to essentially manipulate the supply and demand in the market. So that anti-competitive effect took place in precisely the market that we allege, which was the market for no-fee brokerage services. Well how? In the sense that, what anti-competitive effect did it have between Robinhood and another stock trading app that are out there? I know there's a ton that are listed in the complaint. It didn't have to. An anti-competitive effect can take place in two different ways. One, certainly an anti-competitive effect could mean that there's an injury to one of the consumers. That's not what we're alleging here. An anti-competitive effect can also be a distortion of the market that injures consumers. For example, Your Honor, a price-fixing case. A price-fixing case is an illegal agreement between two competitors that's directly aimed at the consumer. It injures the consumer. It doesn't injure any other consumer. Counsel agree, but it would still be to the relevant market, which would be, if it's a price-fixing for example, that means the price of the no-fee app would now be no longer no-fee. We would all agree that you have to pay a buck per trade. That would affect the consumer. But in the market that's there, what you're alleging, as I understand, is an effect downstream away from the two markets you've alleged to a separate securities market. Am I wrong on that? It's far simpler than that, Your Honor. The relevant market is the no-fee brokerage market.  An exclusion from a market is a classic antitrust violation. How are they excluded from the market when there's, as I count, at least five or six other competitors and at least one of the named plaintiffs was allowed to immediately open a second brokerage account and trade the shares of the relevant securities? Three of the four plaintiffs could not, and we've alleged that millions of these plaintiffs could not switch, and there are specific allegations in the complaint about why you couldn't switch. It takes time to get your money out of one account and put it into the other, and even if you have the separate accounts that you don't have to draw out of Robinhood to go somewhere else, it still takes several days before you can trade. By the time that trading took place, the damage had already been done. Did you not argue, I don't mean you, I meant your side, not argue to both the district court, and did the complaint not allege that the relevant anti-competitive effect is not what you're telling me right now, but instead was that the security value had gone down for your clients and for the class? That's how you would measure, that's how you would quantify and measure the damages suffered by my client, but the antitrust injury that was suffered by my client was their inability to access the no-fee brokerage market. This court's decisions in the Amy case, the mining case, both demonstrate that it doesn't really matter where the damages are suffered. The question is whether there's a connection between the antitrust misconduct and the ultimate consumer. Here, the consumer was clearly the target of that misconduct. Robinhood and Citadel entered into this agreement specifically to target these consumers to protect Citadel's billions of dollars in short interest that it had, and they knew that by turning off the buy button in this app, that would cause the price to go down. But the things that you're talking about that prohibited three of the four plaintiffs from going from one company to another, those seem to be structural things that have nothing to do with any anti-competitive effect. In other words, it just so happens that it takes a few days to open up an account somewhere because they want to check you out and they want to run your credit and all of that. That's precisely what you do when you're alleging a relevant market. You have to allege that there really aren't any reasonable substitutes, and so that's exactly what our complaint does. It's exactly what it is. Well, there are reasonable substitutes. It's that they all do the same exact thing. Right, but they're not a reasonable substitute in this case for the reasons we allege, which is that you cannot switch from broker A to broker B in time to protect your interest. Except for one client who absolutely can do that thing. Right, but remember, we're multiplying this by millions of people. And so they knew that Robinhood had enough customers to impact this market. And so they knew, and this is precisely what the complaint alleges, that even if a significant portion of Robinhood's customers were unable to switch and to make trades, that that would have the desired anti-competitive effect on the marketplace. I don't want to stop you from getting to the other elements. Well, before you leave this one, let me point out one thing that is said in the red brief that picks up on what Judge Luck is discussing right here with you about the various markets that you have pleaded. Opposing counsel is arguing that plaintiffs plead as they do because the Sherman Act has not reached the purchase and sale of individual securities, and they cite the Third Circuit's case in Kalmanovitz. So how do you respond to that issue? In light of all the questions that Judge Luck has asked about the markets that you have pleaded, that you are . . . you've created a market problem for yourself because you're trying to avoid this Third Circuit case. Right. We're not suing the sellers of individual securities here. We are suing two corporations that entered into an agreement to affect the supply and demand of services in the no-fee brokerage market, and our customers and our clients are customers in the no-fee brokerage market, and they were excluded from the brokerage market. And all we have to show under Section 4 of the Clayton Act and under this Court's precedent is that we were, in fact, injured as a result of that exclusion. The fact that we may quantify the damages in the securities market is absolutely irrelevant for the purposes of this discussion. What is relevant is that our clients were excluded from the very relevant market . . . Can I ask you a question, though? I mean, it's sort of splitting the hair a little bit here, but they weren't excluded from the no-brokerage-free market. In other words, they're still allowed to be customers of Robinhood under the terms that Robinhood sets. They were excluded from the securities market, right? That's really what they're excluded from. They were . . . They were Robinhood customers. No, Robinhood didn't say, see you later, you're not a customer anymore. They just said, our terms of service are our terms of service. But they basically stopped their customers from dealing, which is exactly what the purpose of the conspiracy was. You're talking about all of the customers. You're talking about all of their customers, aren't you? All of their customers and their relevant securities, yes. Yes. But . . . The reason . . . But what . . . The market, all of them . . . I'm sorry. They were all excluded, all the customers. They were excluded from the purchase of these relevant securities. Yes. Yes. Right. So isn't the exclusion from the securities market, not from the no-fee brokerage market? I mean, in other words, they could have signed up with any client they wanted to, who had this . . . by the way, had the same restrictions on January 28th and January 28th. But they're not . . . the real problem you're alleging is the exclusion from the securities market, right? What the antitrust laws . . . Am I right? No. What we're referring . . . what we are alleging is an exclusion from the no-fee brokerage market. How? You were Robinhood customers before and after anything happened. Because we couldn't fully participate in that market, which was precisely . . . Not there, not that market. It's the securities market. Let me pull back. I mean . . . and talk about this in the bigger picture. The question under the antitrust laws in terms of this harm to competition analysis is simply whether there is a connection between the conspiracy and the anti-competitive impact that was being caused and the particular plaintiffs here. And that's precisely what we showed. We showed that the plaintiffs were the target of this conspiracy.  The investors were the Robinhood. That's your target, the investors and Robinhood, all of them. The target was, yes, the customers who were investing in the securities through the Robinhood platform. Throughout, yeah. Right. Everybody. Right. And what they intended to do here was simply make it impossible for those customers to purchase those relevant securities. Yes, it's a narrow piece of that. They made it impossible, perhaps, for them to utilize Robinhood's services in the no-fee brokerage market, but they didn't do anything . . . Robinhood didn't do anything to prevent your clients from utilizing the no-free brokerage market by going to a competitor. Right, but the complaint very specifically addresses that point by showing how difficult it is for those folks to go somewhere else. And Robinhood and Citadel knew that. Citadel knew . . . They were frozen in with Robinhood. They were . . . Thankfully, they had no place to go. Yeah, which is a classic . . . Because of the arrangement with Robinhood. This is just a classic market definition. The question is whether there's a reasonable substitute. There wasn't a reasonable substitute. Yes, there may have been a reasonable substitute three days later, five days later, ten days later, but that was far too late to prevent precisely the injury that they intended to cause by this conspiracy. The only question, is there a connection between the conspiracy and the injury to our clients? That's exactly what we proved, and that's enough to get over the threshold of a pleading applausible conspiracy. All right, you have reserved five minutes.  Yes, good morning, Your Honors. May it please the Court, Kevin Orsini on behalf of the Robinhood defendants. Is that better, Your Honor? Excellent. As counsel noted, there were two grounds on which the Court dismissed the complaint. I was going to focus on and will focus on the first ground, which is the existence or lack thereof of a plausible agreement. My colleague from Citadel will address the other point, but just briefly on the other point, before I move to the conspiracy issue, which is the key problem with their anti-competitive effects argument is precisely the one that Judge Luck and Judge Brant have identified, which is there are extensive cases, including footnote seven of U.S. versus Amex, or Ohio versus Amex by the time it got to the Supreme Court, that say you have to allege an anti-competitive effect in the relevant market. There was no reduction in competition in the no-fee brokerage services market that they're focused on in the appeal, slightly different than their complaint. What they're concerned about is precisely what you said, Your Honor, Judge Luck, which is they claim that competition was reduced in the securities market for these particular securities. But your opposing counsel comes up here and says the issue is that because of this agreement and because Robinhood had such a large share of the no-fee brokerage market, putting on the no-buy, not allowing any buys on the 28th, caused an anti-competitive effect for their clients. They weren't allowed to do something that they otherwise would have been allowed to do but for the agreement, right? I think there are two responses to that, Your Honor, and you've given both already. The first one is that that was a pre-existing structural condition in terms of the switching issue that they identified. There was nothing that was agreed to here that changed that ability. Point number two is – Yeah, but can you use a three-sided box to your favor just because you put the fourth side on that to lock somebody in? In other words, it always existed that there were three sides there. You just put the fourth side in there to lock them in for five days until they can open up accounts somewhere else. You can't use that to your advantage, can you? Well, I think that goes to whether or not the challenged conduct caused any reduction in competition as between the participants in the marketplace, the no-fee brokerages. And the answer is it didn't at all. There was still the same competition in the no-fee brokerage market the day after the restraints, the day of the restraints as there had been in the preceding days. And the harm that they're identifying here, they talk about antitrust injury, that's not the argument. It's anti-competitive effect. And the harm here that they're claiming – So the value to customers in the no-fee brokerage market is affected by whether you can buy securities or not? The value of the customers, Your Honor? Yeah, the value to the customers. In other words, if I buy a service and the service gives me A through Z and it had A through Z for years, and then all of a sudden you take A, B, and C out of the picture, I no longer have the same service that I had before, right? They still have the – That's my value. They still have the ability, Your Honor, to purchase and sell securities, just not these particular securities through the Robinhood app. They could purchase – Only the ones I want. I'm sorry? Only the ones I want. Well, there were plenty of other securities that were being traded, including by these or maybe it was you, Judge Luck. The terms of service, Judge Luck, the terms of service for Robinhood had clearly articulated as a different panel of this court held in a companion case that Robinhood could at any time restrict trading in its sole discretion. So the product they had purchased, to the extent we're talking about the no-fee brokerage market, was the product they had that day. And they still had the same competitive options elsewhere. But if I could shift, because I only have limited time, to the agreement point and hopefully convince Your Honor, Judge Luck, why you should be concerned about that one too, plaintiff's complaint on this issue are twofold. They say that the district court was improperly weighing two plausible inferences and that that's not permitted under the law. And they also argue that she improperly, the district court improperly cabined the analysis, my word, not theirs. Our position, Your Honor, is that's absolutely not true. First of all, neither is true. First of all, she never concluded that the allegation of a conspiracy was plausible. She concluded the exact opposite. She said it was implausible. And she concluded it was implausible precisely because of the facts that were alleged in this complaint. And what she looked at was the obvious alternative explanation. No dispute, there can't be any dispute, that she was entitled to do that. This court has said it repeatedly. The Supreme Court has said it repeatedly. And what this court has said repeatedly is that when there's an obvious alternative explanation on the face of the complaint that would lead to a non-conspiratorial action or reason for the action, that the court not only can, but must consider that in analyzing plausibility. Let me be clear. I don't think the district court made any error in how it went about doing it. Any error to me is that there just seems to be a lot of allegations which would suggest that there was something nefarious. Is there not something that also suggests that there was a perfectly valid and legitimate business reason for doing something? Maybe. And I think that's where... So let me address that directly, Your Honor, in the few minutes I have left, which is to explanation. Because what you're looking at when analyzing whether there's a plausible alternative explanation, an obvious alternative explanation is, what would an actor in a marketplace do absent a conspiracy? And in particular, would they do X, the challenge activity? Nine times out of 10, probably 99 times out of 100, you're speculating. Here we're not speculating. Because a dozen other brokers did basically the same thing at basically the same time in response to the same common stimulus. They've alleged this was an extraordinary time period in the marketplace. We agree. There's no dispute on that. What they focus on are a series of... They say, though, that the restrictions that, and I'm sorry to fast forward, but they say that the restrictions that your competitors put on were far less onerous and far less long than the ones that Robina did. Robina did it all the way, as I understand the allegations, until February 3rd. Almost everyone else lifted them after a day or two. They were different in time, but they were similar in type. And they were all reactions to the same phenomenon, which were extraordinary volatility in the marketplace, which then led to these extraordinary collateral calls. And just stepping back on the plausibility of an agreement. What do they have? But to Judge Lord's point, if Robin Hood says, we put these restrictions in place because of the increased NSCC collateral requirements, if those restrictions are then left in place after the collateral situation was handled on January 28th, doesn't that poke holes in Robin Hood's explanation? It does not, Your Honor, because they allege as well that the NSCC, this is in paragraphs 87 to 91, that the NSCC will do additional calls based upon volatility. Volatility, as they allege, was continuing throughout those couple of days after they put in these trading restrictions. But going back to the idea that this was done by virtue of an agreement, the various communications they cite are, first of all, not suspicious here like they are in just about every other conspiracy case. Then what about at 1.41 a.m. on January 28th, a mere 41 minutes after announcing the trading restrictions, Robin Hood Securities COO Jim Swartwell emailed Citadel that, I have to say I am beyond disappointed in how this went down. It's difficult to have a partnership when these kind of things go down this way. Given the timing, what else could he, could Mr. Swartwell be, I'm mispronouncing his name, be referring to other than the trading restrictions? Swartwell, Your Honor, and what he goes on to say in his email correspondence with Citadel that very night is that they weren't going to be able to put in effect what they had been discussing the following morning. In other words, he's saying very clearly what they were talking about could not go into effect that morning, the morning when the challenge restrictions went into effect. And if you back up and you actually look at the correspondence that's in here, which they've cherry picked from various other communications they had that also talk about, it's PFA. It's the ongoing business relationship. So Mr. Swartwell says, we won't be able to do this given the timing. Then at 1 a.m. Robin Hood sends out a communication to its customers saying they're going to do certain things to address volatility. Those things are not the challenge restriction. So they allege in the complaint that the agreement was on January 25th. Then there are these heated discussions. Mr. Swartwell says, we can't do this the next morning. So that this certainly couldn't be what they did the next morning. They then communicate to their customers that they're doing something else. So what's the theory? The theory, I guess, is these were the luckiest conspirators in history because they had already agreed they were going to do something, put in the trading restrictions. Mr. Swartwell had said internally, we can't do it. They went out to their customers at 1 a.m. and said, we're only doing something else, not this. And then miraculously, they got a $3 billion collateral call the next morning. And miraculously, every other market participant did the same thing. And they can't say we knew we were going to get that collateral call because they allege in paragraph 91, we had no idea. Right? So if you actually study those communications between ongoing business partners who have a relationship for remuneration based upon trading, so of course they're talking at the time when you have the most extensive trading ever, you put those together and it makes very clear that they couldn't have been talking about what the plaintiffs are actually challenging. They were talking about something else. And it's just not plausible to believe that they ended up with the perfect cover here, that they'd get that collateral call. I don't believe in coincidences and the court can use its common sense as well, I think, to conclude that that just doesn't hang together. All right. Mr. Orsini, thank you. Thank you, Your Honor. Thank you, Your Honor. And may it please the court, I'm Matt Lemke for Citadel Securities. And I want to turn back to the unreasonable restraint of trade point. And in looking at the plaintiff's argument in their blue brief and hearing what they say today, you cannot reconcile what they're saying with applicable circuit precedent. They say at page 43 of the blue brief, you absolutely do not have to link the anti-competitive effects to the relevant market. And you heard echoes of that here in their opening argument. That is directly contradicted by this court's decision in Jacobs v. Tempur-Pedic, which the court, speaking through Judge Choflat's opinion, said, you absolutely do have to link an anti-competitive effect to the relevant market. And this— Counsel, there's no doubt that that's the case. But what would be helpful to me is to address the arguments that that opposing counsel raised here, which is that we did that in the no-fee brokerage market by limiting the options of what consumers can do in the market. Your Honor, if imitation is the sincerest form of flattery, I think you're going to be flattered because I think you hit the nail on the head earlier when you alluded to the was not exclusion from the no-fee trading app—no-fee brokerage trading app market. They were talking about exclusion from the market for the sale of securities like GameStop. What they're arguing, though—and I'm just asking questions here. I honestly don't know the answer to this. It seems to me that if I were picking the argument that you have the strongest one on, it's the one that you're arguing here in reading all the materials that we've had. But as to that, what they're arguing is that a component of what they were allowed to do in January 27th was something they no longer were allowed to do, again, assuming that there was an agreement to restrict, and that that is the anti-competitive effect. In other words, I was allowed to do something beforehand through your platform, and I'm no longer allowed to do that very thing. Well, I think Mr. Orsini touched on this a minute ago when he said, you know, that's a pre-existing market structure, you know, their allegation that you couldn't switch. Now, you noted one of the four name plaintiffs switched that very day, which sort of undercuts that. But that's not an anti-competitive effect as a result of the conspiracy. I think if you read—they may well have a gripe against Robinhood, which was their provider, although as Mr. Orsini again alluded to in the Hunkadea case, which is coming out of the same MDL, recently this court noted that contractually, they had the right to do it. There may be some arena, but it's not antitrust law for them to bring it. You know, when this court got this unwieldy—when the district court got this unwieldy MDL, the district judge divided it into four substantive tranches, and this is the antitrust tranche. There's a separate securities law tranche that, as of now, she has allowed to proceed past discovery, and they're going to have their chance to try—or to discovery and have the chance to try to prove it. That is the arena, if any, where they can vindicate their gripe against Robinhood. The problem here is this is not a fit for the antitrust laws, and it goes to your point, Judge Branch. The district court sniffed out exactly what was going on with this market definition. They're trying desperately to avoid the market where the anti-competitive effect was occurring, and that is in the market for some undefined market for the trading of these securities. The district court relied on Kalmanovitz, which comes out of the Third Circuit, but which relies on very old Supreme Court cases, Apex-Hosiery from 1940 and the DuPont case from 1956, saying, look, the antitrust laws are about protecting competition in the market for goods and services, and the decision in Jacobs touched on what the definition of a market is. Kalmanovitz says these trading of securities is not something the antitrust laws reach. Securities law may reach it, but not antitrust law, and what do they say in their brief in response to the district court's analysis on Kalmanovitz? Nothing. They don't challenge that holding at all. They have forfeited any argument that that's not right, that the antitrust laws don't reach that market for the trading of stocks like GameStop and AMC and the others. And then if you look at, well, what is the anti-competitive effect that they're talking about? Well, it starts at paragraph one of this 400-plus paragraph complaint, and then in paragraphs three, and again, and I believe it's 354, they talk about the disruption of the competitive mechanism that sets the market price through the forces of supply and demand and thus distorted the price discovery process. That's an anti-competitive effect that they're talking about, but it's not in the no-fee trading app market. It's in the market for the undefined market here, whatever it might be, the market for the trading of securities. That's what it's about. And this exclusion from the market idea that's come flying in here at the 11th hour to try to save them, I don't think that's going to get it done because they're not excluded from the no-fee trading app market. As you alluded to, Judge Luck, they're excluded from the ability to trade in these particular stocks. But if it's the, that's certainly one way to look at it. But I think another way to look at it is to say that by whatever conspiracy or agreement that existed between the two companies, again, I'm assuming that to be the case for the moment, that that caused a restraint in an ability of me to utilize this service that I had before that allowed me to otherwise trade in these things. So it's not the trading in the market. It is at the level of the no-fee app, of the no-fee app beforehand allowed me unfettered discretion and now my discretion is very fettered. But that's not really an anti-competitive effect on the market. It's a disruption in what you expected your use of that app to be. But if the allegation is that Robinhood was the behemoth, I think the allegations are that it's what, 50% of the no-fee brokerage app? Actually, that is not the allegation. 40%? No, the allegation is it was, it was, the only allegation is in a recent time period, it was 50% of the new apps downloaded for that market. But if you look carefully, they don't allege market power. It is not there. All they allege is it's a significant player. But the fact that 50% of the downloads in one month was for Robinhood doesn't establish or create a plausible inference, a reasonable inference to make it plausible that they had this huge market power. And you know, and of course you have all the other brokerages that are out there that were allowing free trading. And I might note that Citadel, there's no allegation that they stopped accepting orders from other brokerages for the trading in these stocks. I see my time has expired. We believe that both grounds demand affirmance and ask you to affirm. Thank you. Mr. Brannick, you have five minutes. Let me just, let me just start for just one second on the conspiracy allegation. I think your honors understand where we're coming from on the conspiracy allegation. The only thing I want to say about that is that the argument you were hearing, particularly from Robinhood here, sounded an awful lot more like a jury argument or summary judgment argument. We have to remember here we're on the pleadings and the only question is did we allege a plausible antitrust conspiracy? And I think it's clear in great detail that we did. What we've said is, and this is my issue with that part of the argument, is what we've said is the complaint must show or the plaintiff must show, quote, independent action is at least as plausible as concerted action pursuant to a prior agreement. In other words, a complaint fails where independent action is at least as plausible as concerted action. So you have to show that it's not at least as plausible or it's more plausible that the concerted action was the reason as opposed to the independent action reason. Right? Isn't that the burden? But I think what you need to do is to look at the cases. That's from Quality Auto. Pardon me? That's from Quality Auto that I just read. Exactly. And I think it's useful to look at Quality Auto and automotive alignment and see what was happening in those cases. Those were just pure parallel conduct cases. It was what I would call a somewhere, somehow, someday conspiracy. There were no allegations about when the agreement took place. There were no allegations about who was talking to whom. It was simply a reliance on parallel conduct. And in those cases, if you have an obvious alternative explanation, then you have an That applies here, too. The alternative theory. Except that here we have specific... On the facts that you've alleged in your complaint. But here we... That's what I look at. Yeah. Exactly. And if you look at the facts that we've alleged in the complaint as to the so-called obvious alternative explanation, we demonstrated with allegations in the complaint why that alternative explanation was a pretext. They said they were relying, they were worried about these collateral requirements. But they found out about this collateral requirement at 5.11 in the morning. And by 9 o'clock, by the time the markets opened, they had that problem solved. So there is significant evidence that there was pretext here. We had evidence of the actual conversations that took place. We have evidence of inside knowledge. For example, the Robin Hood president saying that he was going to be dumping his AMC stock the night before when prices in AMC were still going up. That showed inside knowledge. So when you couple the inside knowledge, the context, the fact that the parties acted pursuant to that agreement, we have so much more than the plaintiffs did in the quality automotive case. So I think our case is much, much closer to the Anderson and the Evergreen cases that were decided in the Second and the Third Circuit. We have exactly the same sort of elements there. If I can, I'd like to then turn back to this competition argument, because I think we're just really overcomplicating this. First, there's a fundamental misunderstanding from the defense in terms of what you have to show. The antitrust laws just talk about an interference with the free market. And that interference can take place in a couple of different ways. One, you can attack a competitor. That's not what we're alleging here. The other way is you can attack a consumer. For example, with a price-fixing case. In a price-fixing case, there is no injury to any other competitor in the market. Your target is a particular consumer. It's the same with a refusal to deal. And that's exactly what we have here. We have just a simple, old-fashioned refusal to deal. They targeted our particular clients, because they knew that if they could convince Robinhood not to deal with our particular clients and the relevant securities, they would get the result that they needed. The market would crash. Citadel would escape its billions of dollars in short position. It's really as simple as that. There's an anti-competitive agreement. These still were customers of Robinhood. I mean, they had brokerage accounts. They were able to trade with the thousands of securities that were out there. They could not trade in the relevant securities. It's a narrow refusal to deal. So then why is it not the securities market that we're looking at? If it's just the security, then why is it not the diminution in value of the Robinhood securities that caused them the anti-competitive injury? But what this antitrust conspiracy targeted was the actions of our clients in the no-fee brokerage market. Our clients could have hit the buy button, but for the conspiracy between Robinhood and Citadel. That was exactly what this conspiracy was designed to do. It was to target our clients' ability to hit the buy button. And because of their inability to hit the buy button, the market crashed. Sure, you're going to quantify the damages our clients suffered by looking at the losses they suffered in the stock market. Old-fashioned ways, which are in effect arguing that they committed a tort. They got together and, forget antitrust, they got together and committed a tort that was aimed at your clients. But that tort was an interference. The tort was to bar your clients, to injure your clients, I'll put it that way. But that tort was an old-fashioned refusal to deal, which is a classic antitrust violation. They just cut you out. Yeah, cut us out of the market. That's precisely our point. What I'm saying is that that's an old-fashioned claim you can allege without the antitrust law. Sure, but we certainly can allege it under the antitrust laws. Antitrust laws certainly recognize that a refusal to deal for anti-competitive purposes is illegal, and that's what we're alleging here. All right, thank you. Thank you both, or thank all of you. We have your case under advisement, and court is in recess until tomorrow morning.